Good morning, Your Honors. They're all leaving. This is the most interesting case. I agree. I agree, Your Honor. It's a very interesting case. Devin Burstein. Good morning. May it please the Court. Devin Burstein on behalf of Mr. Salazar. As the Court knows, there were two searches in this case at the San Clemente checkpoint in September of 2012. Both were unconstitutional. I will begin with the cell phone search, which was the subject of this Court's order. In Riley, the Supreme Court held very simply, our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple. Get a warrant. Here, that didn't happen. The search was unconstitutional, and suppression is the appropriate remedy. How about the good faith? It doesn't apply, Your Honor. Why? And it doesn't apply for two reasons. First, directly under Davis, the good faith exception applies to a warrantless search if that search is conducted in reliance on then-binding circuit precedent. And Davis itself uses the language when the binding precedent specifically authorizes a specific police practice. Here, at the time, there was no binding Ninth Circuit precedent authorizing search of a cell phone incident to arrest. We know that two ways. We know that from, well, we actually know it three ways. The simplest way is by doing just the basic research. We know that from the Eisenhower case, which was the subject of the 28-J letter. And we also know that from the government's own filing before the district court. At page of the record at ER 42, the government, in seeking to defend the search, says several circuits, this is a direct quote, several circuits have held that the warrant exception applies to the contents of an arrestee's cellular telephone. But it doesn't say the Ninth Circuit, because the Ninth Circuit didn't so hold, and that wasn't binding precedent. So under Davis, the good-faith exception wouldn't apply. But even if the Ninth Circuit had held that you could search a cell phone incident to arrest, it wouldn't matter in this case because this wasn't a proper search incident to arrest to begin with. Yeah, but, you know, don't we have to just look at just on the question I asked you. I mean, isn't it important to consider the — whether the — where the arrestee is located at the time of the search? Exactly. Here they were — here they were handcuffed. They were sitting on a bench about 10 to 15 feet away from the car. The cell phone was in a console, I think, correct me if I'm mistaken, that was in the middle of the two front seats, and — That's correct, Your Honor. Certainly was not within reach. Precisely, Your Honor. You're making the point that I was — and you're making it a lot better than I was about to make it. And so the point is — Well, make it. The point is it's not even a search incident to arrest under Gant, under Stoner, under this Court's decision in Maddox. It wouldn't even qualify, leaving the whole Davis issue to the side. This wouldn't qualify as a proper search incident to arrest under any precedent, going all the way back to Chimmel. And that's what — You're relying on Davis, which is Federal law, but these were State agents, right? No, Your Honor. This is a Federal — the Federal checkpoint at San Clemente. So it was Federal agents. Federal all the way around. So, right, there would be no — this wouldn't be the type of habeas situation where we would be looking at what the State agents were — if the State agents were relying on binding California Supreme Court law, that would be a totally different situation. A much harder situation for me, no doubt, but we don't have that issue. Let me ask you this. If we were to apply harmless error review, and I know you may dispute whether that review is appropriate for a situation like this, wouldn't the Court's admission of the cell phone be harmless? There was hardly any discussion about that during the hearing. No, Your Honor. There was no admission of the cell phone. This is — what the government has done is it — trying to say it as nicely, it's not — it's not a reasonable argument because there was no trial. There was no admission of cell phone. This is a conditional guilty plea. But the denial of a motion to suppress, that's why I preface my question with, if we were to apply harmless error review, why is the denial not harmless given that that played very little to no part as part of the hearing? But the question is harmlessness in terms of the guilty plea. This is a conditional guilty plea. So the harmless error analysis has nothing to do with trial evidence or — or — or anything else. The — the question is would it be harmless in terms of whether it led Mr. Salazar to plead guilty? That would be the harmless error analysis. That's what the Tenth Circuit does in Barnard, is they look at, in terms of — because harmless error in a trial would be, well, did this — No, I understand that. But that's why it's relevant to me that the cell phone records played a very small to maybe even nonexistent part of the whole suppression. Nobody talked about that. So in what way did that affect his decision to plead guilty? Well, that's — that's the — that's exactly the crux of the question that Barnard says. This would be the government's burden to prove beyond a reasonable doubt harmlessness. And on this record, they say — I'll just quote, they say, An appellate court will rarely, if ever, be able to determine whether an erroneous denial of a motion to suppress contributed to the defendant's decision to plead guilty unless at the time of the plea he states or reveals his reason for pleading guilty. And that didn't happen here. Going on to — to Barnard, they say, In the context of a plea, the record will be unlikely to contain enough information for an appellate court to reach this conclusion beyond a reasonable doubt. Unlike a verdict, which must necessarily be based exclusively on the evidence submitted at trial, a defendant's decision to plead guilty may be based on any factor inside or outside the record. Thus, only the defendant is in a position — only the defendant is in a position to evaluate the impact of a particular erroneous refusal to suppress evidence. Only Mr. Salazar can tell you what was in Mr. Salazar's head when he decided to enter the conditional guilty plea. And I would also point the Court to Rule 11. I believe it's Rule 11a2, which is very direct on this issue. And it says that the remedy for what — for — in terms of a conditional plea, and I'll quote, it says, A defendant who prevails on appeal may then withdraw the plea. That — it's clear, plain, simple language. That is the remedy. If this is a conditional guilty plea, you can — the Court can see that at ER 13. Mr. Salazar specifically preserves the right to appeal this, and the remedy when the — if the suppression ruling was incorrect, and it was, certainly as to the cell phone, the defendant gets to withdraw his plea. And that is the only remedy that we're asking for, which is the exact remedy that Rule 11 provides and what Barnard suggests and what the unpublished decision in Grubbs suggests. Do you want to talk about the redacted records? Yes, Your Honor. I would love to. Thank you very much. In terms of the redacted records, we know from Thomas that — and from Sedano Arellano, which long predates this case — that the redacted records were improper. That's not a valid basis for making a reliability determination. So the question really then boils down to prejudice. And I think that that is a fair statement, and I think the government would agree with that statement. In terms of prejudice, I would like to point to two things in the record and then a bit of an aha moment I had last night, if the Court will permit me. In the August 17th — Who did you have it with last night? An aha moment. Aha. Aha. It just came to me. Yeah. So — Aha. Go ahead. Thank you, Your Honor. So the two things that I've noted in my brief are that in the August 17th record, the agent reports — this is the reviewing agent or the trainer's — says that Charlie has a strong alert and he sits and he stares at the It says that when Charlie is on odor, Charlie the dog, he will not leave the area until at the source of the smell. Those two things were not with — the trial attorney didn't have the benefit of those two comments. Our position is that those two comments would have been very useful in terms of cross-examining and impeaching Agent Gonzalez, Charlie's handler, because Agent Gonzalez said that Charlie didn't have a specific alert behavior. And we know from watching the video that Charlie, in this case, is all over the place. He's not sitting and staring ever. So that would contradict it. But there's a — now, to my aha moment, if the Court will permit me, there's a bigger problem than the specifics in not having the unredacted records. We know, long-established law, that a checkpoint can't be pretextual. It must serve primarily an immigration purpose. And that's why the government is always saying the dog is not searching for drugs. They're searching for people and drugs. It's always people and drugs. Because otherwise, the checkpoint and — or at least the search would be completely unconstitutional as serving a primary drug-based purpose. So I went — as I was going through the records, thinking about prejudice last night, it dawns on me, not one of those training incidents has anything to do with people. They're all drugs. Every single instance is drugs. He's trained on drugs, drugs, drugs, drugs. Now, if I'm the trial lawyer and I see the unredacted records and I see no mention of people whatsoever, well, all of a sudden now my focus is on pretextual. I'm going to now argue, this is a pretextual — excuse me — a pretextual drug-based search. It's not permissible under any of the Supreme Court's or the Ninth Circuit's checkpoint. Well, aren't they searching for people who use talcum powder? Talcum powder or who knows what else. But it's — it can't be drugs. And these unredacted records sure look like Charlie is a drug dog. And that would have been my argument. That's additional prejudice from — in terms of — I don't know how you train a dog, why you — what good it would do you to train a dog to alert on people. He's alerted on everybody. Your Honor, that's part of the problem. But what the government always says is — and what they said in this very case is we were concerned that somebody was maybe hiding in a secret compartment, and that's why we need Charlie, because they can't bring him over to search for drugs. They have — it has to be part of the immigration purpose. And what I'm doing is really taking a step back and trying to think, as a trial lawyer, if I have these unredacted records, how do I make the best use of them? And if Charlie is just a drug dog, this stop is — this search is pretextual, and that alone would have gotten me suppression. So there's the prejudice in terms of the cross-examination, and then there's the greater prejudice that I think I've identified for the Court. Well, but they're looking for people in possession of drugs. No, Your Honor. They're looking for people undocumented. That's what the government says they're doing. The government says we're looking for undocumented people hidden within the car. It doesn't look to me like Charlie is ever trained to do that. To me, that's something I would certainly want, as the defense lawyer, to tell the district court about. The defense lawyer in this case was denied his ability to do that. I find that particularly prejudicial in the redactions. I see I have a little bit of time left for rebuttal, if there are no questions at this time. Thank you very much. Good morning, Your Honors. May it please the Court, Mark Rahe for the United States. I'd like to actually pick up right where my opponent left off. If you want to talk about these three points of prejudice, not one of them is singularly persuasive. First of all, as for the aha moment, anything going to pretext has absolutely nothing to do with the reliability of this dog, Charlie, to detect drugs, which is the only issue before this court on appeal. Not only that, in S.E.R., our one document in the record, this dog was certified to smell both drugs and people, and that's what the hand was to him. I think, unless I'm misunderstanding counsel's aha moment argument, that he, had he known that this dog was trained to detect drugs, he would have moved to suppress based on the fact that the stop was pretextual. So in that way, the redaction really hurt his ability to evaluate his case. I hope I'm summing it correctly. That was my understanding. I see vigorous nods here. So that's the significance of it. I think it's a pretty good aha moment. How do you respond to that? I disagree, Your Honor. I mean, what are we supposed to be talking about here, reliability of the dog? Not only that, if you go through the excerpts of record, the defense started, they actually made a motion below already to suppress for pretextual. If you look at the initial papers, there's lots of briefing on that, but then they chose to withdraw that issue. I mean, I don't understand how that has anything to do with the reliability of Charlie. Plus, they knew about that issue, and they gave it up. And just because there's, you know, six months of training records that they think don't go towards people, I mean, that's something, you know, the record's not developed on that. But what I would like to focus on are the facts. But could they have made the argument that he says he would have made had he known that this dog was trained only to detect drugs? I suppose they could have made it. Nothing would have happened from that. Well, was there an evidentiary basis for Counselor Goldford with that argument? I don't believe so. But like I told you, Your Honor, I mean, these issues soiling for 15, 20 years ago, this is a recurrent claim. They moved it in the papers, and then they chose not to develop it any further. Because they didn't have the evidence for it. They didn't have the evidence to support that. Right? I mean, all honesty, this is like an entirely now different appeal here. I mean, I don't know what they asked about this stuff before. I thought we were here to talk about the reliability of the dog, with all due respect. I mean, you know, they could have made that argument. They did make that argument. But if the question is, you know, Thomas, that is the sole case they rely on, is supposed to be about the reliability of a detector dog. It has, you know, here the idea was that the dog alerted to drugs. Look at the two examples that my opponent points out. When he talks about the August 17th record, and I think this is really important, when you read the actual quote, it says, Canine has a strong alert and nice indication. Sit and stare at source. In his written brief, he eliminates and nice indication, replaces it with ellipses. As we pointed out in our paper, there seems to be a fundamental misunderstanding on the part of the defense as to what the relevant factors are to dog discovery. And it starts with their complete failure to cite Florida v. Harris in the opening brief, and where they want to put greater weight on real-world accuracy when the Supreme Court said in as many words, it's training that matters. In Thomas, this Court held it's black-letter law, an alert is different than an indication. All you need for probable cause is the alert. Here, the unequivocal testimony from the dog handler was that there was an alert, and I believe that's an excerpt of record page 121, because the dog's breathing changed, its tail wagged, and its tail went up. That's actually excerpt of record 102. What my opponent is referring to about him sitting and staring, as also pointed out in the authority in our brief, that's the indication. That's when the dog has zeroed in and pinpointed on the source it's no longer moving. So for him to say that, to leave out that nice indication with ellipses, and suddenly make this Court believe that the alert is based on sitting and staring, that's a misrepresentation of the record. And in addition, as for the other document that the defense points to, I believe he was the one who asked for the dog's records. They asked for the dog's records, yes. They got redacted records. They got redacted records, correct. Yeah. And isn't that what the problem is? Well, it is now.  Well, why is it that you have to redact the dog's records? It's my understanding it's for operational security. Why? Because if it says, you know what, the drugs were buried at 3-1⁄2 inches, and the idea is, well, then the cartels, you know what, will bury it at 3-3⁄4. What's that? Say that again. Here's an example. It's operational security. They're worried. They didn't redact the scores. What they redacted was the kind of drug and where it was placed. Like it indicates 3-1⁄2 inches, 3-1⁄2 feet. What they're worried about is that, wow, if this gets into the hands of the cartels, they're going to figure out that these dogs are good at training, you know, at detecting drugs at certain levels. I mean, that's their institutional concern. Well, the solution to that is a protective order. And the protective order could have happened had the defense objected. That's what happened in Sedano or in Sedano-Ariano. At least you had the in-camera review. My point wants to give the impression that somehow we really pulled a fast one on him. They only requested these documents. I don't know that you've given that impression. Well, he says that we committed a discovery violation in our report. This is not a murder case with capital punishment. I understand that. I'm getting so excited over a dog. Well, you know, when I look at the reply brief, and it accuses the government of chutzpah, of a discovery violation, look at the site that the defense cites, Excerpt of Record 71. We get a lot of stuff from the government that's not very nice either, don't we? Well, I thought we were here to argue, Your Honor. I mean, don't you want some spirited discourse here? Yeah, yeah. But I don't want you to get a heart attack. I won't, Your Honor. I appreciate the concern, but I won't. And, you know, I'm very interested in these dog cases. You know why? I don't. Because 40 years ago, when I was on the district court, I got reversed in a dog sniffing case. Oh. Yeah. And the dog's name was Blue. And I think the other dog was Vita. And I got hate mail from all over the world. I'm sorry to hear that. I still have it. I'm going to send them to the Smithsonian. So I'll have you read those cases. Anyway, people get emotional over dogs. I know that. Okay. I like to bring passion to the table. I love what I do, Your Honor. So I apologize if it comes up. I'm just, you know, you've been growling, you've been howling. Fair enough. I mean, I've known you for a long time. I don't want to see you hurt yourself. It's very kind of you. I appreciate that. Let me ask you this, counsel. In order to show that the error is harmless, the government would have to basically show that nothing in the unredacted records would have changed the ultimate finding that there was probable cause in this case. And, frankly, sitting here as a reviewing court, it's hard for us to assess whether something would have changed or not. Is the appropriate remedy then, as what happened, I think, in Thomas, is a remand for the district court to essentially to foredo over, so defense then has the opportunity with the full unredacted documents to demonstrate that there's a reliability problem? Why isn't that the appropriate solution for this case? Because it's not a close question, Your Honor. As we point out, when you look at these unredacted records, or even, you know, when they were redacted, there are 696 individual scores. 3.5 is passing. Charlie had three 4s in 696. That's less than 1 percent. The dog, Benny, in Thomas had 54. And, in fact, he had them on every single record. He had them on a record that was one week before the search in that case. None of those things is true here. You look at these things, great team, great nose, the only criticism you see is a couple times the dog's either too amped up because it was in the kennel too long, or it's a little too tired. Or they're tired. Or it's tired because it's hot out. You know. Correct. Yeah. But if you look in those three. The main society doesn't like what you're doing. They probably don't, you know. Those three 4s that Charlie got, not one was for alert, not one was for indication. That's the issue here. Rule 52B is in place for reason. And we stand by the plain error claim in this case. This record could not contrast more sharply with that in Thomas. In Thomas, the defendant objected verbally during the suppression hearing about the redactions. He filed a written memorandum to the magistrate. And then when the magistrate came up with report and recommendations to the district court, he objected to that. Here, there was not a single word of objection. And this was maybe why it sounded like I got a little heated earlier. It wasn't until 2 in the morning before this hearing on February 7th in 2013 that the defense even specifically requested these records. Earlier that same afternoon, our trial prosecutor had turned over those 11 pages of redaction and the one page of certification. The defense trial lawyer, Paul Barr, is very capable, very experienced. I would submit to the court when somebody hands me a blank piece of paper or somebody hands me a paper with black lines through it, I don't need to be F. Lee Bailey or an eighth grader to say, you know what, if something's hidden behind those black lines and I have a problem, I should say something about it. Crickets. You have absolute silence. This doesn't allow the district court then to look at the things in camera or to potentially do a protective order. That is why the Supreme Court has said Rule 52B matters, and for plain error review, the burden of prejudice is on the defendant. Speculation is not enough. In two months, he got a two-month reply extension for the reply brief, had 3,000 extra words left in that reply brief. The only two examples that he can point to from these records, one of them he puts ellipses in where it says indication, and what I was going to point out with the other one where he talks about the dog doesn't leave the area, if you look at excerpt of record page 148, the few times that Charlie left the immediate vicinity of this vehicle, the handler testifies he came back on his own. He didn't need to be brought back. So that's not inconsistent with that June record that the defense is pointing to. Those two little things are all they talk about. In any other plain error context, Judge Winn, I'm sure you could say about every one of those. You know what? In theory, we could go back, do it perfect. But just as it's often said, the defendant's entitled to a fair trial is not entitled to a perfect trial. Here at the time, those redactions, they were consistent with practice. I believe I cited some anecdotal examples from Arizona. Thomas doesn't come out until the day this defendant is sentenced, and eight months after his evidentiary hearing. It gave him an aha moment. What do you want to talk about the cell phone? Yes, absolutely, Your Honor. Let me just make a comment. Yes. This bothered me for a long time. I know there's a lot of tension between the U.S. Attorney's Office and the defense in San Diego. And I don't know whether Mr. Burstein is with the federal defenders of San Diego or not. Are you? I was for five years. What? I was for five years, Your Honor. Well, I can tell that. Yes. Okay. I just want to make sure. So there's a lot of tension between these two groups. Correct. And you know what that stems from? You know what it stems from? The sentencing guidelines, because you've got all the power, right? So some people say. Well, what do you mean some people say? It's a prosecutor decides what the sentence is going to be by the way it's charged, right? Yes. And you've got these onerous sentencing guidelines. So the power is moved away from the trial judge to the prosecutor. It's been over 30 years, maybe longer than that. Am I right? Yes. So that creates all these problems. That's what does it, because they feel like they don't have, you know, a chance, unless they plead guilty, unless they plead guilty early. If they go to trial, oh, we've got to add that up, make it tougher, huh? We've got all our prisons filled up today, too, because of it. So it's that tension that goes on. I know it exists. And it's a problem in many areas throughout the circuit. And so someday it would be good to get rid of them, but I doubt if that's going to happen. I doubt if that's going to happen. First of all, the judges today, the young judges, whatever age they are, I don't know, except for Manny Real, anyone who's worked under the old system. And this is what causes these tensions. That's why they have these ha-ha moments. You know, that's what's doing it. I appreciate those comments, Your Honor. Yeah. You know, there's some truth to what I'm saying. There's not this collegiality, huh? You know. No. It's not good. Not good for the system. Okay. Oh, man. Go ahead. All right. All right. I believe you asked about the cell phone. Yes. As Judge Wing pointed out, I mean, when my colleague comes up, ask him to identify a single one of the fruits from that search that was incriminating or that's even at issue. Our point was this was always an afterthought. Rule 11a2 is not entirely clear on what happens in a mixed situation. There's out-of-circuit case law. I can provide it in a Rule 28J. I know the Sixth Circuit has a case called Leak. It's not unambiguous what happens in a mixed-win situation. All it says is if a defendant prevails on appeal, he's entitled to withdraw his plea. These other circuits have a rule if it's not a material part of the plea or the most damning evidence, you can reach out. And, in fact, he cites Tenth Circuit. I know there's a case that comes after it. Our position here is where, I mean, it's their bringing the motion to suppress. We, to this day, still don't know what they're talking about. We disavow using any of these things. They don't say what it is. How could that have been a material part of the plea? This is a case about conspiracy to transport methamphetamine. That's where 99 percent of the energy of the litigation. But what does the record show the government could have proved? As to? As to whether he committed the crime. Oh. Registered owner of the vehicle. His odd behavior of feigning sleep shows consciousness of guilt. The drugs were found under his seat and the co-defendant implicated him. And a substantial quantity. I know there's, you know, a case law from the circuit that says you can infer guilty knowledge from substantial quantity or at least a substantial value of drugs. Because here there was, you know, one and one quarter or kilos. But that was, you know, basically it. I mean, but that's all you need. And I don't know, you know, I'm sorry the time has gone quickly here. I know there was a thing about good faith. I don't know if you want to hear anything from the government on that. I mean. So what was in his cell phone would basically have nothing to do with his bringing this stuff over the border. I mean, even the 28J District of Nevada case that he cites on Davis, it says there's a text message in there linking him to sale of heroin, and I believe the actual transaction for which he was arrested. Here, the record. I mean, if you're going to move to suppress evidence, it would seem that you would need to identify that evidence which actually matters. Kagan. And I ask counsel that because I think even the Ninth Circuit law is a bit of a mixed bag in terms of harmless air review with regard to conditional pleas. And I just couldn't. I looked at the record to see what evidence that was derived from the cell phone was at issue, and nobody talked about it. Everybody sort of forgot about that. And I think it is an open question. I believe the defense cited an unpublished case. It was actually amended to delete that second footnote that says we don't engage in harmless air review. So it's definitely an open issue here. And just before I forget, Your Honor, this was by Federal agents, but a lot of times those checkpoint cases, their cases can go State or Federal when it comes to drugs because there's concurrent jurisdiction. So to the extent you had California Supreme Court authority in People v. Diaz allowing that goes to that Davis issue of binding appellate precedent. And I thought I'd point it out because I know earlier it sounded like you thought maybe they were State officers. They were definitely Border Patrol. But their cases can go either way. And at the time of arrest, they have no idea, and it's not up to them to make the charging decision. So unless there are any further questions, the government would submit. The best way to handle these is have a trial judge review in Canberra with some idea of what, say, the party is looking for. And I wouldn't disagree with that, Your Honor. And had there been objection? Has that been done? Well, not in this case. I believe going forward, yes. And in fact, yeah. But in this case, you know. This is actually happening down in San Diego where these dog records are handed to a district judge. I believe it. And then decides that this is prejudicial. He has to do it. I don't have any personal anecdotal knowledge. He has to do it. He's going to do it. But he has to do it knowing what's important and what isn't important. It happened in the Sedano-Arellano case because the defense brought that to their attention. But here, I mean, this is a Rule 16 discovery claim. No objection about Rule discovery below. Rule 16 discovery below. And I know my opponent would say that he somehow preserved this claim because it's always been part of the same argument. That's apples and oranges, too, Your Honor. I mean, Judge Subraw had zero intent or zero warning that this could ever be an issue. Had the defense objected, as the defendant did three times in Thomas. The defense get the redacted. Well, he got them on December 6th, whatever the day was right before that hearing, at 2 in the afternoon. I think it was December 6th. It was the day before. And at 2 in the morning that night, it's funny. It's like ships passing in the night. He makes an excerpt of Record 71 for the first time he cites Sedano-Arellano and asks for training records and certification. And then they come into court the next morning. I believe it's excerpt of Record 89 to 95. There's six or seven pages of preliminary discussion with the district court about the parameters of the hearing, anything, any concerns. Defense counsel acknowledges receipt of the material and says absolutely nothing about, oh, I've got a problem, that there are things. Well, this was before. I mean, while the case was going in trial. Well, it was a conditional plea. This was before the hearing. I mean, the conditional plea. Correct. Before the plea. Before, after the plea, or before? Oh, no. A couple of months. I believe the plea was in May and the hearing was in February, so 2013. A couple months. Yeah. Three. A couple months before the plea. Correct. See, another thing, when you take a plea today, you have to give up everything, every conceivable thing. And so the defendant really doesn't have much except a conditional plea. We see a lot of conditional pleas. Yeah. So you ought to lead a movement to eliminate the sentencing guidelines. Well. It's just, it's ruined the whole system. The probation officer. Booker made an advisory. It's headed in that direction anyway. You know what that is? Everybody plug your ears. Advisory. Then why does everybody do it? And you've got 35, 53 coming in. And now the Judiciary Committee is changing. So I don't think there's much chance, much reform there. But someday it will collapse. Do I understand your position on the dog, that Charlie's record is better than Benny's record? By orders of magnitude, yes. Okay. What was that, orders of magnitude? Yeah, that was a little bit of a flourish. I just think it's a lot, lot, lot better. What's better? Charlie's record. I mean, three. Charlie's a good dog. Yeah. They do work them hard. You know, sometimes they really have to have a union, you know. And the handlers. Because some of those dogs used to check the mail, walk all day like this. What the hell are we doing here, you know? Or give them a biscuit for every 10 letters. No, I know. I think they're wonderful dogs. Yeah. I have pictures of some of them. The handlers give them out at judges' conferences. And if you're nice, the dog will give you a footprint. I like that. Okay. Thanks. Thank you. You want to rebut? No. What? If the court doesn't want to hear it from you, I can see it. No, I think we heard plenty. Okay. That's it, huh? Go read my case, U.S. v. Solis. It's a bad stuff. And the reversal, too, you know. Don't think I don't remember stuff. Your Honor, Mr. Rainey and I get along very well outside the court. Do you? Yes. I want you to come out here and shake hands. We are quite collegial. Well, he just leaned back, you know. No, no, no. Okay. All right. Thank you, counsel. Thank you. All rise. The court for this session stands adjourned.
judges: Schroeder, Pregerson, Nguyen